The Judges delivered their opinions.*
Judge Carr.
This is a case of Probate. George Redford died at a very advanced age, without wife or child, and possessed of a tract of land, and a number of slaves. A paper was produced to the County Court of Powhatan, purporting to be the Testament of Redford. There was no witness to it; but persons were produced to prove that the body of the writing, as well as the signature, were wholly written It is a Testament of no notice be-big taken of the Testator’s land, and the whole intent of the paper appearing to be, to give freedom to his slaves, and directions the dispositions to be made with respect to them, if the Laws did not permit them to remain in the State. Executors were appointed; but, the contest here is, between the slaves seeking Probate, and the Administrator resisting it. The County Court decided, that the paper was not the last Will of Redford, and ought not to be recorded as such. On appeal, the Superior Court reversed this decision, and directed the paper to be recorded as the last Will and Testament of Redford; from which the appeal is taken to this Court.
In the argument of this cause’, there were (among others) two re ry important questions raised, which I do not mean to consider: t. Whether the Ecclesiastical Law, with respect to Testaments was the-Law of this State: 2. Whether a To^inmcd of personal's, written *326 (body ail'd signature) by the Testator himself, can be established on proof by one witness of the hand-writing. I do not examine these points, because I can decide this ease with perfect satisfaction to my own mind, without touching them.
The first witness to the hand-writing of the Testator, is Henry Watkins; and I consider his evidence full to the fact, and given under circumstances entitling it to great weight, He says that he is well acquainted with Medford's hand-writing: that he became familiar with it in 1793, and from thence, for tun or fifteen years, they did much business together; so that the hand-writing was nearly as familiar to him as his own; that after this, the Testator growing old, did much less business of that kind which required him to write more than his name; with his manner of doing which, the witness continued familiar to the time of his death: that he believes the whole Will to be in the hand-writing of Medford: that he knew the signature as soon as he saw it; but, of the body oí the Will, he at first had doubts, the hand-writing in that part be-much for the since he was familiar with it. lie states then, the course of reflection and examination, which, the aid of refreshing his memory by inspection of some papers in his possession known to written by Medford,) nished all doubt, and enabled him to speak with confidence. The resort to these papers was not improper; and I repeat, that so far as one witness could go towards it, this hand-writing is proved.
Next is the evidence of Claiborne Watkins, who says, “he has seen the Testator write his name frequently to receipts, and believes, from comparison, that the paper now in cotroversy, with the signatui’e, is wholly in the hand-wri ling of the Testator; believes he should not have boon able te-prove tbe hand-writing of the Testator, except from comparison of the signature with the receipts aforesaid.
It was objected, that this evidence was not admissible, being founded on comparison of handwriting.
In the first place, I question whether the strict rule with respect •to the admissibility of evidence before a Jury, applies to a Court, who, in a question of Probate, are la^ffSge upou the whole matter, both of law and fact, and who, by their Constitution, are the tribunal in all cases to decide the Law.
But passing this by, I think that before a Jury, the evidence of this witness would be admissible; its weight, of course, to be greater or less, as to the Jury should seem right. When it is laid down as a rule, that evidence by comparison of hands is not admissible, -we must recollect, that “by comparison, is now meant a comparison by thr juxtaposition of two .writings, in order, by such com *327 parison, to ascertain whether both were written by the same person. See Slarkie’s Evidence, vol. 2, p. 654, and the cases he ekes. Formerly, if a witness, called to prove hand-writing, said he had seen the party write, and believed this to be his hand; this was considered as evidence by comparison of hands, and as inadmissible, at least in criminal cases; as appears from the Statute reversing the attainder of Algernon and in the ease of the seven Bishops. 4 State Trials, 338. ' But, such evidence is clearly admissible now, as legal proof of hand-writing, and considered as distinct from evidence by comparison. This is laid down as settled Law, by FeaJec, Phillips, and Starlcie, and the cases they refer to, to supjjort them. There is also a strong case upon this subject, Eagleton v. Kingston, 8 Ves, 472. Nor do the cases stop heve. In Lord Ferrers v. Shirley, Fitzg. 195, Lord Raveion», laid it down, that it was not necessary in all cases, that the witness should have seen the party write, to whose hand he swears; for, if there has been a fixed correspondence by letters, and it can be made out that, the party writing such letters, is the same man that attested the Deed, it will enable the witness to swear to that person’s hand-writing, although he never saw him write.
The general rule seems to be, that the best evidence of hand-writing is-the witness who actually saw tire party write it; but, as this can seldom be had, in its absence, any person may be called to prove the hand, who has, by sufficient means, acquired such a knowledge of the general character of it, as will enable him to swear to his ñeñe/', that the writing in question is the hand of that person; and this knowledge may be acquired from having seen him write, though but once, or from a correspondence with the party on matters of business, or from any other transactions between them; as, from having paid Bids of Exchange, according to his written direction, for which he after-wards accounted, bee the cases referred to by 2 Starkie, 651-2-3. This doctrine has been often acted upon also in Now-York.
In Titford v. Knott, 2 Johns. Cas. 211, the Plaintiff called hid confidential Clerk to prove the endorsement of the note by the Defendant. The witness tesSftfed, that the Plaintiff and the Defendant (who resided in London,) had long been correspondents, and that these letters came to his bands; and though be had never seen the Defendant write, he believed the endorsement to be his hand from the knowledge he had acquired from the correspondence. The opinion of the Court was delivered by Kent, J., who said, that the evidence was undoubtedly admissible and competent; that it was usual for witnesses to prove hand-writing from previous know - ledge of the hand, derived from having seen the person write, and *329 from authentic papers received in the course of business. He added, “if the witness has no previous knowledge of the hand, he cannot then be permitted to decide it, in Court, from a comparison of hands.” The same question was settled in the same way, in Jackson v. Van Dusen, 5 Johns. Rep. 144; Johnson v. Daverne, 19 Johns. Rep. 134; see also, Peake’s N. P. Cas. 21; 1 Esp. Cas. 15, 351-2.
Now, what is the evidence of C. ■Watkins? That he has frequently seen Redford sign his name to receipts, and believed from comparison, that the body and signature of the Will was wholly written by him. If he had stopped here, there could have been no question about this evidence; for, the comparison spoken of, would have been taken as nothing more than that comparison which every witness must make in his mind, when he testifies in a case of this kind. But he adds, that he believes he should not have been able to prove the hand, except from comparison with the signature to the receipts aforesaid. Now, it must be observed, that this comparison was not made by placing the different papers together, and thus forming an opinion; nor was it made in Court, by a witness having no previous knowledge of the hand, and then for the first time deciding from ■ comparison. But, this was a witness who had often seen the party sign his name to receipts, and who having, as it would seem, those receipts in' his possession or power, resorted to them (I presume after he heard that he was to be examined as to the Will;) and having refreshed his memory by inspecting them, says, on his examination, that ho believes the Will is in the hand-writing of Redford. From the cases cited, I believe that this would have been good evidence, if he had never seen the party write. Suppose he had had dealings •with Redford, and had paid him money, upon which Redford had (though not in his presence,) executed these receipts, and given them to him, he had looked at them, after receiving them, and then put them safely away. Afterwards, on being told that he would be ealled on to testify as to Redford’s hand-writing, he had turned to these receipts, examined them carefully, put them away, and in .Court had said, he believed the Wfl^was written by Redford, and stated these facts as the grounds of his belief. The ease would have stood upon the same ground with those, where a knowledge was derived from letters in a course of correspondence, or paying bills by .his written directions, &e.
But, the case is stronger here: for, Watkms had often seen Redford write; and though he says he believes he could not have proved the hand-writing, without a recurrence to the receipts, he does not say that his present opinion is derived wholly from that source. He *330 might liave a recollection of the party’s writing, from having seca him write, bat so faint and indistinct, that he could not, from it aíone, have proved Use Will; and yet, this recollection might form a material ingredient in his present belief. I am decidedly of opinion, shat he was an admissible witness.
in addition to this, there are strong and pregnant, circumstances, (•«ucun-lng to support the witnesses. In a Deed, dated the 16th of November, 1803, liudjbrd sel free a negro.boy named Will. In lí;S i, he made a Will, by which he gave some of his slaves to bis w ife for her life, and io he free at her death; the rest of them to be '■free on his death. These papers, (proved to be genuine,) taken in connection with the Will of ISIS, show a fixed determination, during all that time, to free his slaves. When his wife was living, he gave her some of them for her life; bat she being dead, and he having no child, the slaves seem to have been the first objects of his bounty. There are in these paper? some other striking peculiarities, strongly indicating that thuy arc She work of the same hand. One is, his manner of spelling the word emancipate. It is used four limes, once in the Heed, twice in the second Will, and once in the last; and each time, it is spoil inz-mancy-pale. I have never seen it so spelled before; and I think it a strong circumstance, hi addition 1o this. Halford told Purlin??, the year before he died, which was after the dato of (his last Will.) that he had made a Will in his wife’s life-time, in which he. had given her six or seven negroes,; but that since her death, he had made another Will. Nobody speaks of any other than this, except. Unit in 1820; which, though certainly not proved, and too imperfect for any thing, I have a strong impression was written by jRc¿ifurd: and if so, still further shows, how strongly possessed he was (¡f (he idea of freeing his slaves. The circumstances on the other side deserves no weight in my mind; and I am dearly for affirming the Judgment.
Judge Gkskn.
The paper offered for Pra^jgte, as the Will of George Redford, is alleged to he wholly written and signed by him. There is no subscribing witness to it, nor any* proof that it was acknowledged by him as his Will, to any person whatever; or that any person ever saw it, until after George Bedford's death. The proofs given to establish the fact, that the Will was wholly in the hand-writing of (L Redford, arc the. testimony of flenry fValkins and Claiborne. Watkins; the first of whom testifies, that he is well acquainted with Ins hand-writing, and believes that the paper in question was wholly in his hand-wridng, including the signature thereto: that Iw nns *331 familiar w i'ih. liis hand-writing from 17S3, and for ten or ill been years-did much business with him, and was as familiar with his handwriting as with his own; and after that, becoming old, he did much less business of tire sort which required to write more than his name; with his manner of doing which, he continued familiar until the time of Ills death: that in Radford’s general hantl-wriling, there was a, manifest deterioration since he had been in the habit of doing business with him, as aforesaid; but, that he knew the signature to the Will to be his, as soon as he saw it: that the hand-writing of the body of the Will is so changed, sinde the witness did much business with him, as aforesaid, that had he seen it without the name and signature, he doubts whether he could have pointed out the Author, and thinks he could not have done so, without some circumstance, other than the writing itself,-to point his attention to him: that, if he had been named, he would still perhaps have hesitated to say it was his hand-writing, until his memory was refreshed on the change produced by old ago, by reference' to other papers, which from time to time the Testator had written, and were in the possession of the witness; and in thus refreshing his memory, the witness says, that the writing, though worse, retains in a good degree its original character; and on-close inspection, he now verily believes that the Will is wholly written by the Testator, and he thinks he should have said so without reference io any other paper, but not with that certainty and promptness, that he would have answered as to the signature; that, with respect to the isignature to a memorandum at the foot of the Will, the Christian name is unlike the Testators writing; so that, seeing that without the other, he should have said that he did not write it; but, the surname appears to be written by him, his manner of making the 2?. being very peculiar.
The other wiLncss testifies, that he has frequently seen the Testator write his name to receipts, and believes from comparison, that the paper in question, with the signature, is wholly in his handwriting; but, believes he should not have been able to prove the hand-writing of the Testator, except-from comparison with the signature to the receipts aforesaid.
Upon this evidence, the Appellant insists, that the paper in question is not proved to be in (he hand-writing of lledford; or if it is so proved, it is only proved by one witness, and that the proof of one witness is not sufficient to establish a Testament of personals. • :
The proof by the first witness is certainly full to the point. It is sufficient for the proof of hand-writing,-that the witness states that he is acquainted with it, showing that ho had due means of forming such *333 an acquaintance, and that he believes from that acquaintance, • that it is the hand-writing of the person; and this is the substance of the testimony of the witness. He concludes, that upon close inspection, he verily believes it to be the hand-writing, and thinks he should have said so, without reference to any other paper. That he had actually referred to other papers to refresh his memory, does not impair the validity of his testimony, and but slightly affects its weight. It can hardly be expected, that any cautious and conscientious man would speak promptly and confidently upon such a subject, which is at last only a matter of belief and opinion, without a close inspection of the writing, and refreshing his memory by all means in his power. It is like an acquaintance with the human countenance. We frequently know the face upon first sight, without knowing when or where we have before seen it; and having forgotten to whom it belongs, we are reminded, by eiroumstances brought to our recollection by some extraneous information, of the name of the person, and the time place and circumstances of our former acquaintance, which enables us to speak with confidence as to the identity of the person; not upon this information, but upon our own recollection thus refreshed, although time may have made a considerable change in his features. One speaking confidently, under such circumstances, would be entitled to belief, in a degree little, if any, less than one who had a daily and intimate intercourse with the person in question.
I think the proof of the other witness, incompetent. though he had seen Redford write, he does not profess to be acquainted with his hand writing, and declares that his belief is founded on comparison with other writings, which he knows to be genuine; but could not say, that such would be his belief, except from such comparison. His evidence is nothing, more than would be that of any other; who compared the writings proved by this witness to be genuine, with the writing in question. I am not, however, prepared to say, that in a question of Probate, such a comparison might not be made between writings admitted, or clearly proved (by witnesses above exception, and who had seen them written,) to he genuine, with the writing in question. Such evidence has, it seems, been usually admitted in the Courts of Probate in England, and they have even called to their assistance in making the comparison, experienced Proctors. There seems to be a difference between submitting such papers for comparison, to the inspection of a Jury, (which cannot be done,) whose judgment on the fact cannot be revised, and to a Court of Probate, whose judgment in that particular may be revised. There is, however, no occasion to consider this *334 question in this cause, since no siteh comparison was made in the Court below; the receipts, spoken of by the witness, not being produced. ■
This, then, presents the question, whether sueh a Testament can be established, upon the proof of one witness.
The Ecclesiastical Courts of England have jurisdiction of the Probate of Testaments of personals, and-proceed, in the exercise of this jurisdiction, according to the Civil Law in respect to Testaments; with this difference, that' abandoning' the solemnities prescribed by the Civil Law in ordinary cases, they adopted the rules of the Civil Law as to Military Testaments, and applied those rules to all cases indiscriminately. By the Civil Law, soldiers in actual service might make testamentary dispositions, without any solemnity whatever, even without writing, and might revoke them in like manner. They might die intestate in part, and in part testate; they might appoint a. temporary heir; they might pretermit their own children, and might call ány number of witnesses to their Will, many or few, so that there were a sufficient number to prove the fact, of the Will, according to the general rule of the Civil Law, which required two witnesses to establish any fact. These privileges were allowed to no others. Vulteius (or Vultijus) hi Instituí. 262, see. 4. * This was the outline of the English Law; and hence the power to disposeof personal property bynuneupative Wills was unlimited, until restrained by the Statute o,f Frauds of the 29th Car. 2, except as to soldiers and seamen, who were unrestrained by that Statute. 1 Rob. on Wilts, 161. Both before and after this Statute, any scrap of paper not signed by the Testator, whether written by himself or another, might be established as a written Will, if it could-be proved to have been written or approved by the Testator, aninio testandi; and even after the Statute of Wills of lien. 8, the principles of the Ecclesiastical Law were applied to Wills of land, before the Statute of Frauds; the Common Law Courts only requiring, that it should be in writing, no matter by whom written, nor whetlzer it was signed by the Testator, azid attested by witnesses subscribing their names, or not. See the cases collected by Roberts on Wills, 15, 22, 149, 156.- The total absence of all solemnity in making testamentary dispositions, which prevailed, was a strong reason for enforcing the Civil Law rule, that such Testaments could zzot be established, any more than any other fact, by *335 less than two witnesses to the facts necessary to prove the Will; Otherwise, a single person might, dispose of the estate of a decedent, by writing himself any paper, and testifying that it was written by the direction of the deceased, and approved by him as his Will. Accordingly, there is no rule, better established in England, than that as a general rule, no Testament can be established the evidonee of a less number of witnesses than two. Whether there is an exception in the ease of an olograph Will, will be the subject of enquiry hereafter.
.Bructon lays down the rule in express terms, B 2, ch. 26, sec. •.!, i£ Fieri debet testamentum liberi homhiis, coram duobus vet pluribus viris Icgilibus et hotiesiis, clericis vet laicis, ad hoc special ter convocatis.” In repeated instances, attempts have been made to compel the Ecclesiastical Courts to admit Wills to Probate, upon the proof of one witness, by prohibition; which has been uniformly denied by the Courts of Common Law, upon the ground, that this being a'matter of Ecclesiastical Jurisdiction, it belongs exclusively to them; and according to-their Láw, a Will cannot be-proved by less than two witnesses. Many cases to this effect are collected in all the Abridgments, under the title Prohibition, which it ¡s unnecessary to examine particularly, since all the Elementary Writers agree lhat this is the general rule.
Upon the settlement of Virginia, all the La^vs of England, Common, Statutory, Chancery, Maritime, of Merchants, and Ecclesiastical, so far as they were suited to the circumstances of the society,, were introduced with the Colonists. The jurisdiction for the administration of all these Laws, was vested originally in the General Court, consisting of the Governor and Council, and has been gradually distributed, as convenience required, amongst the various Courts established from time to time: but, the tranfer of jurisdiction [eft, the principles upon which it was administered, unchanged and unimpaired. Fcannot doubt lhat the Courts of Virginia, having the Probate of Testaments of personals, were always, and are now, hound to proceed according to the Ecclesiastical Law upon that subject, that being as much a part of the Common Law in its enlarged Wmsc, as it has been adopted here, as the La\v Merchant or Chance- . j v Law. The security against fraud, intended by the requisition of two witnesses, was as necessary here as in England. This doctrine, and upon these principles, has been affirmed in Pennsylvania; ■ in the case of Lewis v. Maris, 1 Dall. 278.
Tho case of Glasscock v. Smilher & Hunt, 1 Call, 479, is supposed, and at first view seems, to be contrary. But a careful , examina;ion. of the report, and the original record, and the *337 manuscript note of Judge Pniwm.r.yon, the President of the Court, will show that this question was not considered or intended to bn ■decided. The paper presented as the last Will, was not wrillen o>’ •signed by the Testator; but, a single word was interlined with his own. hand. At the same timo, a Will previously made and duly executed, was also presented; and the Court below held, that tin. last paper was not such a u subsequent Will, Codicil, or Declaration in ivriling,” however proved, as would, under the Act of Assembly, lie sufficient to revoke a former Will duly executed. At least, this was considered as the ground of the Judgment by the Court of Appeals, as appears from Mr. Pendleton's note; and is indicated by the Judgment of the Court, which was pronounced, not on evidence given to the Court of Appeals, (as it must have been, if the validity of the second Will had been in question,) bufón tlie record onljT. In the first ease, the Will must have been, finally established or rejected; but, the case was sent hack, that the paper might be recorded as a Will, unless it was contested on some other ground. Other than what? Than that it was not a sufficient Will, Codicil, or Declaration in writing, however proved, to revoke the former Will.
The question remanís, whether there is in this respect, any distinction between a Will wholly written by the Testator and others. There seems to have been a distinction by the Civil Law, in the case of Military Testaments, between written and unwritten Testaments. u Be mili lis volúntate, constare potest eliarn sine testibus, cx scripiura ipsius; quod si in nulla appareat scripiura nun - cupata cjus voluntas, duobus minimum leslibus probanda esl, non quo modo el qua forma ieslamentum fact um sit, sed testa ■ mentum factum esse.” Vulteius, for Vultajus) 263, see. I. The difference seems to me to have consisted in this; that ihe Will ivas nuncupative, it was necessarily to be proved by :d least, two witnesses called upon to.witness that such was his Will: in the words of Bracion, “ad hoc specialiter corivocalis;” but if written, then, whether written by the Testator, or only signed by him, the mere fact of his writing or signing it, proved by any witnesses, (by proving his hand-writing or otherwise, whether they knew it to he, or were called upon to witness it as his Will, or not,) was sufficient to establish it as a Will; but that two were indispensably' necessary to that end, as in all other cases to establish any fact ‘whatever. The declaration of Swinburne, p. 300, that if a Will be wholly written, or only subscribed by the Testator, it will be good without any witnesses at all, can only mean that no subscribing witnesses, nor any called specially to witness that such a Will had been, *338 made, were necessary; but that in that case, proof that the Testator had written or subscribed the paper purporting to be a Will, by any person who neither saw him write or sign it, nor heard him declare that it was his Will, or that he had made or signed any Will, would be sufficient proof that it was his Will. It surely did not mean, that no proof of the writing or subscribing, was necessary: for, without such proof, the Court could not know that it it was written or subscribed by him. In giving the proof of the fact of writing or subscribing, two witnesses were necessary to establish the fact, as any other fact in the Ecclesiastical Court. ££ Unius responsio testis omnimo •non avdiater.” Cod. 4, 20, 9.
It is said, however, by Roberts, p. 199, that where the Will has been wholly written by the Testator, and there are corroborating circumstances, the clear testimony of one witness has prevailed in the Ecclesiastical Court. He cites no authority for this; and if it is so held, this is probably a relaxation of the Civil Law rule, as it is relaxed in the Court cf Chancery, allowing the Defendant’s Answer to be overruled by one witnoss and strong corroborating eircumstanccs. Roberts also states, that it is said that one subscribing witness is sufficient, but, for this he refers to no authority. In Twaites v. Smith, 1 P. Wms. 10, a Will, proved by one subscribing witness, failed simply on the ground, that there was but one such; the other two being incompetent.
It is however, I think, unnecessary in this case to enquire, how far the original rule requiring two witnesses in all cases, (which, considering the total want of solemnity in the execution of Testaments, ought not, in general, to be departed from,) has been relaxed in England, when the Will is wholly written by the Testator, or signed by him in the presence of one subscribing witness, or how far, in the latter case, the rule should be relaxed here; sinee I think our legislation has a decisive effect upon the question, as to an olograph Will. Such a Will of lands may he established under our Statute, by the proof of one uncontradicted and uaimpeaehed witness; and this is such a legislative declaration that such proof is sufficient for any Will, as, I think, binds the Court conclusively. The maxim, omne majus continet in se minus, might be well applied.
But it was argued, that as in the case of Eagleton v. Kingston, 8 Ves. 438, so in this, the custody of the paper, and the declarations of the Testator, were sufficient to show, that although written by him, it was either improperly procured from his imbecility, or was not made animo icstandi. It seems to me, that the fact is directly the reverse; and that the circumstances show clearly, that it was written as and for his last Will, and in pursuance of a long set- *339 tied determination in respect to thfe-■ disposítí^ti of his property. The facts relied upon by the Appellant, are, 'first, that- upon an examination of the Testator’s papers, by .various’persons examing different parcels: at the same time, the paper-in question was not found: that they were thrown loose into a.-box, \'tyhi|h was carried toa one of the slaves Sy the Will and the paper afterwards found upon the top'átSÍ-ÚSt©-in the box; there being a crack in it, through wííich tbé-páper could have been introduced, although it was locked. Fr.om this it is inferred,' that the paper was in the possession of the slave who carried the box. If the paper was in the box, with the other papers belonging to the Testator, it was in the proper custody; and I think it very probable, that the examination was very hasty and careless, from the manner in which it was made. But if it were really in the possession of the slave, that was no improper custody, but where (if that slave was one in whom- the Testator had confidence,)’ it might well be expected to be found. The testator was a very old and infirm man, without auy family, or any one living with him but his slaves. The object of emancipating them, was steadily in his mind for several years; and he might well suppose, that his Will in the hands of one of them, would be safer than with his other papers, .which, after his death, might fall into the hands of some one interested, to suppress the Will, which had no provision in it, but to emancipate his slaves. If this werq the case, the fact that the slave -having the custody of the Will, slipped it into the box, may well he accounted for by the embarrassment, which one ignorant aftd friendless, and of that class, might feel, as to the proper course to be pursued on such an occasion.
Another circumstance relied on, is, that another paper, dated two years after the paper in question, purporting to be signed and written by the Testator, was produced’by another of his negroes, who said he had/ound it near (he gate; and which H. Watkins, the witness who-proved the Will of December, ISIS, to be in the Testator’s hand-writing, declared he did not- believe to be in the Testator’s hand-writing. This paper, in which the words are very badly spelled, and some of them not written with all the letters belonging to them, and in broken sentences, purports tobe a Will written in three successive paragraphs, each signed G. Eedford, and the first and last dated the It is ciphered. It gives to Betsey Fortines a mare; and her colt, if she had one, to Jane; a gig and gig-mare to Lucy Davis-, all the cows, to Joseph and Benjamin Davis, except one to Mrs. Jordan¿ and L. Davis to keep all the cows she already has. It re". *341 iLi,'., ho ir, very weak and sick, and sets all his negroes free in '.aeh of the. paragraphs, and leaves $5 lo be equally divided at his death, between Mary and Daniel; and requests Joseph and Lucy D<u:\; to sec them righted and set free. This paper is dated only a days before the Testator’s death. His Will was offered for Pro-hale on the 21st of December; and it was some days after his death, '■hat the Will was found. I have my'self, little doubt, that this paper was also written by the Testator, and given to one of the negroes, when he was, as it states, very sick and weak, and at broken miervais. The spelling is very had in the papers proved unquestionably to have boon written by him. He was very old and infirm. ' when he wrote the Will in question in ISIS; and his hand-writing had Ucsi male!lady changed, though retaining enough of its original character to he identified by those who had before known it. Two 3-ears alter, upon the eve of dissolution, the character of his writing; ¡night well be supposed to have so changed, that nono could affirm •■hut the}' believed it to he his. If this was a forgery, it affords no presumption that the former was so.; for, the person who could have ’.mlaied his hand-writing in lS18,and write intelligibly in his name, cuhl surely have imitated it as well, and written as intelligibly in .. S20, as before. He would never have fabricated such a production >s that of 1820, when that of 1818, having the same effect was in
Anoikoi circumstance relied on, is, that the. Testator had froquent•1v declared his hostility'- to free negroes, and that he would nolomau- -, ¡pate any of his, and wished that, there were no free negroes in the '••late. This may? be well, accounted for. In 1803, he had executed .5 paper in the form of a Deed of Emancipation of one of his negroes, which he had kept by him until his death, and which appears to have been intended to operate as a Will; for he desires, ■-hat. “the said Will be by the Court set, free; and that i?. Ma.rcy end Jl. Ma.rcy se to the carrying the same into effect;” and noted at tito foot, “the above is done at the request of them that ir. no snore.” In May, 1811, he made a Will, afterwards cancelled, by which he gave to his wifi; a part, of his slaves for tier life, and then to be free, and if they could not he permitted to stay in the Slate, he requested his brother to carry them to the. county of Shelby', in ’itentucky; to enable him to do which, they were to serve him five years. All the rest were to be immediately free; and if they' could not stay' in the Stale, to serve his brother five years, except Will, the one mentioned in the Deed of 1803, (then only’LS years old,) who was to serve four years; and each to have $3 out of his estate, uud his small cart and horse to enable them <0 remove: his brother *342 living in Miel by county, Kentucky. He gave his land to his vr;ffor life, and the balance of his property absolutely, but made no further disposition of his land, and begs his .Executors, Flisfut Maary and Josiah Fortines, to use their best endeavours to fulfil his desire, by “trying the Assembly to git them suffered to stay in this Con - momvealth, as many of them have husbands and wives to leave behind, and they are industrious and honest any other slaves/-" Tl/s, was in the Testator’s own hand-writing, ami without a witness.
One of the Testator’s negro women hada free negro fer a husband who is proved to have been a bad and troublesome man: and in consequence of this connection, he sold her in January, 1812. This accounts for his expressions of hostility to free, negroes, made subsequently. On the other hand, it is proved, that he was very tender , to his slaves, and seemed to feci much for them when distressed; and that the year before he died, he told a witness that he had made-a Will in his wife's life-time, in which lie had given her six or seven negroes; but that since his wife’s death, he had made another Will.
It is impossible to examine the documents and evidence in this cause, without a perfect conviction, that the writing in question ivas written by the Testator himself, as and for his last "Will, and in pursuance of a long settled determination to that effect. The word emancipate, is uniformly spelled in the same way, in thi.confcsscdly genuine writings of the Testator of 1803, and 1811, and .m that in question, “immancypatc;'” and the general character o', the composition and phraseology of all these papers, are the same; the peculiarity of omitting many of the smaller words is alike in ail. Tut above all, there is a perfect identity of objects in all. In his fir^t Will, of 1811, his wife and negroes were the sole objects of his hinu'.ty. He left the rei’crsion of his lands after his wife’s death, undisposed of. Tu his last, his wife being dead, his whole care was for ihe emancipation of his negroes; and he left all the rest of his property undisposed of. He knew there ivas some obstacle io emancipated slaves remaining in Virginia; and in the Deed, he appoints persons to solicit the Court to set Will free; and in the two Wills, he provides, that if the General Assembly will not permit his slaves to stay here, they shall be carried to another State, at the expense of bis estate, in part by the first Will, and in whole by the last.
The last objection is, that the Will is imperfect; the Testator not having done all he intended to do, as he concludes the writing, ‘‘Witness my hand and seal,” and failed to a'ffix his seal. This, 1 ffiink, entitled to no weight; and upon the whole I am clear and -'•vafi/ent in die opinion, that tho Judgment should be affirmed.
*343 Judge Coalter.
This is a case of considerable consequence on the subject of the _ Probate of Wills, and ought to be examined with caution and deliberation.
If I could be satisfied that Claiborne Watkins’s testimony was competent, it would relieve me from the consideration of other questions, as to which I have some difficulty. This Will is offered as one altogether in the hand-writing of the Testator. It has never been published in the presence of any witness. It is not enough to prove that the signature is in the hand-writing of the Testator; the proof must go to the hand-writing of the whole Will.
A Testament of chattels, written in the Testator’s own hand, though it has neither his name nor seal to it, nor witnesses present at its publication, is good, provided sufficient proof can be had that it is his hand-writing. 2. Black. Com. 502. What is sufficient proof of this? According to the Canon Law, which is recognized as obligatory on the Common Law Courts, the proof of hand-writing, as well as any other fact, before a Court of Probate, must be by two witnesses. Lea v. Libb, 3 Salk. 396; Twaites v. Smith, 1 P. Wms. 10; Shotter v. Friend, 2 Salk. 547. This is the Law of England, and was our Law also, obligatory on our Courts of Probate, and now obligatory on them, unless it has been altered, as to Wilis in the hand-writing of the Testator, by some Statute.
If there are two witnesses in this case to the hand-writing, we are relieved from the enquiry, whether there has been any alteration in this respect, by our Statute.
Henry W. Watkins is undoubtedly one competent witness as to the hand-writing, not only of the signature, but of the whole body of the Will. Is C. Watkins a witness as to either? He says, that ho has frequently seen the Testator write his name to receipts, and believes, from comparison, that the paper in controversy with thes;^nature, is wholly in the hand-writing of the Testator; believes ho should not have been able to prove the hand-writing of the Testator, except from comparison with the signature to the receipts aforesaid. This is the whole of his evidence as to the hand-writing.
If -his evidence is competent, then, whether it is entitled to much or little weight, is not the question now under consider-would be two competent witnesses as to the handwriting, and then the only remaining question would be, as to the sufficiency of the whole evidence to establish the Will. He does not profess to have seen the Testator ever write any thing, except his -signature, which he had frequently seen him write; yet. he testifies *345 io the whole body of the Will signature and .all. Had he confined {lis testimony to tlie signature alone, which; in a case of a Will of chatties, would not be a necessary part of the Will, and had said nothing about , the hand-writing of the body of the Will, it could not perhaps be said that there were two witnesses to the hand-writing of the body of the Will. A witness, who has only seen a party. write his name, may' not be able to form an opinion as to the hand-writing of the body of the paper, which, in this casé, it is necessary to prove; -proof merely of the signature not being enough. But here, the witness undertakes to speak of the hand-writing of the body of the Will, as well as of that of the name subscribed; and although his opinion might not be entitled to very great weight it is still legal and competent evidence, if there is no other valid objection to it. A witness may have very full knowledge of the hand-writing, or he may have seen him wrife only a few woi’ds, and only once. The iveight of the evidence Is one thing; its competency is another. 1 Phill. Evid. 422. But he says, from comparison, he believes it to be his hand-writing; believes ho could not have proved the hand-writing, except from comparison with the signatures to the receipts. What kind of comparison he made, does not appear. It does not appear that the receipts were in Court; so that he made the comparison when he gave his evidence. If such was the fact, and if that would alter the case, it. ought to have appeared in the Bill of Exceptions. There can be no doubt, I pre - sume, that if a witness knows he is ab'out to be examined as to handwriting, and has frequently seen the party write, and has in his possession papers that he saw him-write, and looks at them •so as to refresh his memory as to the-character and manner of writing, and then deposes, that this would not destroy his testimony. A witness is called on to identify .a man he had before known; but, before he sees him, he looks at a picture which he recognizes to be a likeness; which recals the features and expression of countenance, and notwithstanding alterations by age, &c. he testifies to his identity. He might have been able to identify him, without havinglooked at the picture; yet, he may think, that was a material aid to him in doing so. He knew him, however, formerly; and on the whole, thinks he is the man. This would be a very different thing from the evidence of one, who never knew him, but who identifies him by a, mere comparison with the picture. Why shall a man, because he has seen another write, be better able to judge of hand-writing, than he who is a good judge of writing, and who has on the trial, compared fair specimens of his writing with the paper in question? I suppose it is because he acquit-es a better know- *346 ledge of the character of the hand, by seeing him write, and has a knowledge of it previous to the dispute, and is not governed by a mere juxta-position, and comparison between papers, of which he has had no previous knowledge. A witness may believe, that he cannot prove the hand-writing, having no recollection of it, until it is produced to him; and then, be knows it. A witness, having authentic writings in his possession, which he has not seen for many years, may believe that he cannot prove the hand-writing, until he •sees those papers, and he may then recollect it. Had the witness said, that on seeing the receipts, though he knew them to have been signed by the Testator, he still had no recollection of the hand-writing, then he could have given no other evidence in the case, than any other judge of writing could have given; except to prove that the had been the Testator, so as to show that they were fair specimens of his signature, to compare by, If such- was, in reality, his testimony, it ought to have been so stated. He has certainly more knowledge on the subject than one who acvev saw v*»íc, and iK-v.IVe, I cannot say he is ineo< .•peteei, merely because he hue h c'r,ü at writings known to be wive; gs of íhe.Tosíaior, v.niess lie had gone on to say, that having dj.ce so, he sLill had no recollection of his hand, and spolce entirely from comparing the one writing with the other; in which case both ought to have been before him at the time he testified; as must have been the case, bad the comparison been made by one who never saw him wrtie. It docs not appear, nor can it he presumed in this case, that he had had the Will at his house, and compared the writings, or that he had compared them together in the Clerk’s Office, where it seems this paper had been lodged for some time before the trial.
On the whole, it seems to me, though not without some doubt, that however small the weight due to this evidence, it was competent, and that consequently there were two witnesses to the handwriting.
This relieves me from the necessity of deciding positively, the very important question, whether, because our Act of Assembly, 1 Rev. Code, 375, has made a Will, if written altogether by the Testator, a good Will of lands, that the intention was to alter tbe Law as to the number of witnesses necessary to establish such Will. As at present advised, however, I cannot think it was the intention of the Legislature to lessen the guards theretofore existing, as to the proof of Wills. It requires two subscribing witnesses as to Wills of lands, where not so written by the Testator; leaving the Law as to personals as it stood before, to wit, that the witnesses need not subscribe, and that the testator need not srgtj such Will. In other *348 respects, they were left equal, the Law requiring no greater number of witnesses as to Wills of real estates, than those of personate. If Wills of lands were proved here as in England, merely before the Courts of Common Law, some argument might be made, that the Common Law mode of proof was intended. But, the same tribunals are to take jurisdiction of Probates of Wills of lands as of personals; and if it was intended to place Wills of lands on a different footing from those of personals, where written by the Testator, or to alter the Law as to the kind of proof in the latter case, it seems to me it would not have been left to mere implication. The man who forges the Will, may prove it.
From the view I have taken of this case, it is perhaps not necessary for mo to do more than to suggest my present impressions as to this point.
In addition to the two witnesses in this case, there are strong corroborative circumstances in favor of this Will, which I need not re - capitulate. One has had a good deal of bearing on my mind. The Testator, in all the Wills and instruments which have been produced, has shown an intention to do his own writing. He has never called on any one else to write for him. This shows, that, he was apprised that a Will in his own hand-writing was good without witnesses.
The sentence of the Superior Court must be affirmed.
Judge Cabe Li-
lt is essential to the proof of hand-writing, that the witness shall be acquainted with the hand-writing which he is called on to establish. The mere fact of having s.een a person write, if it did not impart an acquaintance with the liand-writing, is of no importance whatever. I am, therefore, of opinion, that Claiborne Watkins was an incompetent witness.
Upon the other points in the cause, I concur in opinion with Judge Green; and he has gone so fully into them, as to leave me nothing new to add.
I am of opinion, to affirm the Judgment.

The Phesmevb absent.

 This Author is a German Commentator on the Institutes of Justinian. His Work, which is written in Latin, is very rare and ancient.. Tire title is “ Hermanns Vultcji, J. C. la Instituciones juris civilis a Jusiiniano Compositas, Commentartus ft was printed at Jtlarl/urg, in Hesse, in 1605.